## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CLAIRISSA HANSEN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:25-cv-913-CLS** |
| | ) | |
| WHITE OAK TRANSPORTATION, | ) | |
| INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Clairissa Hansen was employed by White Oak Transportation, Inc., as a truck driver from November 29, 2022, until February 1, 2024, when she was terminated in the aftermath of a motor vehicle collision. She subsequently filed this suit, asserting a claim of gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This opinion addresses the company's motion for summary judgment. Doc. no. 12.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport* 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921 (alteration and emphasis supplied).

## II. FACTUAL BACKGROUND

White Oak Transportation is a privately-owned corporation headquartered in

Decatur, Alabama.  It provides "dedicated transportation services," meaning that it is the exclusive transportation service provider for its customers.[1]  Plaintiff was hired as a truck driver for "local routes" on November 29, 2022.[2]  During her employment, plaintiff resided in Georgia, and her routes included round-trips from Jefferson, Georgia, to South Carolina and Decatur, Alabama, and from Rome, Georgia, to Decatur, Alabama.

## A.    Defendant's Standards of Conduct and Disciplinary Policies

White Oak's employee handbook contains a list of "Conduct Rules," which are described as "standards of behavior" that the company "expects all employees to observe . . . while at work."[3]  The list includes the injunction of:  "Carrying out assigned duties *and following reasonable instructions or requests from supervisors and/or management*."[4]  A warning that "Failure to follow the . . . standards will lead to disciplinary action, up to and including termination," follows the list.[5]  The handbook then sets out the following rules:

**<u>CORRECTIVE ACTION</u>**

To maintain a high standard of conduct and productivity, the Company's

---

[1] Doc. no. 14-8 (Durbin decl.) ¶ 3.

[2] Doc. no. 14-1 (Plaintiff dep.), at 24, 66.

[3] Doc. no. 23-1 (White Oak Transportation Employee Handbook), at 42.

[4] *Id*. (emphasis supplied).

[5] *Id*. at 43 (ellipsis supplied).

policies must be enforced. If an employee violates the standards and policies of the Company, corrective discipline may be necessary. Corrective discipline will be based on the severity of the conduct or policy violation. The Company has a progressive discipline process that is followed for most cases of conduct or policy violation. *However, there are some conduct and policy violations so severe that they warrant final warning or termination on the first offense*.

## **CORRECTIVE DISCIPLINARY GUIDELINES**

At White Oak Transportation, we believe individuals are responsible for maintaining a good work record. When a problem arises, we have found that corrective action and individual counseling are the keys to helping a person get back on track. The offenses listed on the following pages are based on a system that distinguishes between *General Offenses* and *Intolerable Offenses* and may be combined for discipline purposes. **All disciplinary actions remain active for one (1) year**.
Any combination of *General Offenses* which results in an employee accumulating three offenses in any twelve (12) month period will be considered *excessive* and will result in termination of employment. *Any Intolerable Offense will normally result in termination of employment on the first offense*.

\* \* \* \*

Discharge will result when an employee's total discipline (within a rolling 12-month period) is *excessive* as outlined above [*that is*, three *General Offenses* in twelve months will be deemed "excessive," and result in *termination*].

*Intolerable Offenses* are reviewed by *the Director of Safety* to determine the facts and decide whether immediate termination of employment is warranted, or a lesser degree of discipline is appropriate based on the circumstances of each case.

Any employee may be suspended without pay pending completion of an investigation.

*Each behavioral or performance problem must be evaluated within the context of the specific facts and circumstances involved*, and the appropriate discipline, up to and including discharge, will be administered based upon that evaluation.

Doc. no. 23-1 (White Oak Transportation Employee Handbook), at 44-45 (all cap, underlined, and bold-face emphasis in original, italicized emphasis and bracketed alterations supplied).

The handbook also contains "Lists of Offenses" which are "intended to provide <u>examples</u> of the types of behavior that *may* result in disciplinary action," but which "are not intended as an exclusive catalogue of all offenses that could result in disciplinary actions."[6] The catalogue of behaviors that can lead to disciplinary actions is divided between "General Offenses" and "Intolerable Offenses."[7]  "Failure to follow instructions" is described as a "General Offense,"[8] whereas "Insubordination" is characterized as an "Intolerable Offense."[9]

## B.    Accident Protocol

The handbook instructs employees who are involved in a traffic accident to report the incident by calling the company's dispatcher, and, Director of Safety.[10] It

---

[6] *Id*. at 45 (underline in original, italicized emphasis supplied).

[7] *Id*. at 45-46.

[8] *Id*. at 45.

[9] Doc. no. 23-1 (White Oak Transportation Employee Handbook), at 46.

[10] *Id*. at 74.

also includes the following instructions:

> **NOTIFICATION: All accidents, regardless of how minor must be reported by the driver to your immediate supervisor.  Your immediate supervisor will direct you what to do next.**
>
> During the weekends and evening hours, report the accident to your immediate supervisor and they will refer you to the Safety Director.  It is the responsibility of the driver, not the law enforcement officer, to notify the Company.
> All accidents must be reported immediately.  The only exception is if the driver is hospitalized as a result of the accident and cannot make the telephone call.
> Effective accident investigation is dependent upon detailed original accident reporting.  Be as thorough as possible when you make your original report to the Company.  Our response is based on your original report to the Company.  All of our initial decisions are made based on your original report.
> **DO NOT DISCUSS THE ACCIDENT** with anyone other than company personnel.  In the event of death or serious injury give the authorities at the scene only driver's license and registration.  *Make no admissions of guilt.*  What you say can be held against you later.  Before making any statement to anyone, please check with the Safety Department.  This is for your protection as well as the companies [*sic*].
> **COOPERATE WITH US.**  Accidents usually involve Federal, State and local authorities, each requiring a report.  These reports must be submitted on time.  You will be asked to aid us in the completion of these reports and necessary statements.  <u>Follow the instructions you are given by the Safety Department</u>.

Doc. no. 23-1 (White Oak Transportation Employee Handbook), at 75 (boldface and

italicized emphasis in original, underlined emphasis supplied).

Each of White Oak's trucks is equipped with a "SmartDrive and Omnitracs

camera system,"[11] which is described in the employee handbook as

> a forward and rear facing system designed to exonerate White Oak drivers in the event of a crash. *The SmartDrive and Omnitracs system is also designed to allow the Director of Safety to proactively assess any risky or unsafe driving habits observed. Only the Director of Safety will have access to the footage.* White Oak drivers are NOT to cover up the rear facing camera.

*Id*. at 64 (emphasis supplied). White Oak's Director of Safety, Jim Durbin, stated that, if his initial review of the camera system footage clearly indicated that a company driver was not at fault in an accident, he might provide the footage to the responding law enforcement officer via the driver.[12]

Following an accident involving a White Oak driver, Durbin either meets in person with the driver at White Oak's office, or speaks to the driver by telephone, depending on whether the accident occurred in the local area of the company's Decatur, Alabama headquarters. There are several purposes for such meetings. The primary purposes are twofold: to review the camera footage, and, to obtain the driver's account of the accident.[13] Durbin takes a statement from the driver and, together with review of the police report and footage from the SmartDrive and Omnitracs camera system, creates an "accident file" for each event.[14] In addition, if

---

[11] *Id*. at 64; doc. no. 14-8 (Durbin decl.) ¶ 7.

[12] Doc. no. 14-8 (Durbin decl.) ¶ 8.

[13] *Id*. ¶ 9; doc. no. 14-4 (McClaine dep.), at 46.

[14] Doc. no. 14-8 (Durbin decl.) ¶ 9; *see also* doc. no. 14-4 (McClaine dep.), at 49.

the accident is deemed to have been one that was "preventable," Durbin "coaches" the driver on actions and maneuvers she or he could take in the future to avoid adverse consequences.[15]

## C.    Plaintiff's Accident

Plaintiff was assigned to drive an out-of-service truck from defendant's Georgia facility to its Decatur, Alabama headquarters for maintenance.[16]  As she neared the Decatur facility early in the morning hours of January 31, 2024, at around 5:30 a.m., another vehicle struck her truck.[17]  The driver of that other vehicle left the scene of the collision.[18]  After contacting law enforcement, plaintiff reported the incident to Daniel Howell, the company's Safety Coordinator.[19]  In turn, Howell instructed plaintiff to contact the company's Director of Safety, Jim Durbin.[20]

Plaintiff did so, and Durbin told her that he had reviewed footage of the accident from her truck's SmartDrive and Omnitracs camera system.[21]  Durbin instructed plaintiff not to provide the camera footage to the law enforcement officer

---

[15] Doc. no. 14-4 (McClaine dep.), at 88; see also doc. no. 14-8 (Durbin decl.) ¶ 9.

[16] Doc. no. 14-1 (Plaintiff dep.), at 32.

[17] *Id.* at 33; doc. no. 14-2 (Alabama Uniform Traffic Crash Report), at ECF 89-93.

[18] Doc. no. 14-1 (Plaintiff dep.), at 47-48.

[19] *Id*. at 33-34.

[20] *Id.* at 37.

[21] Doc. no. 14-8 (Durbin decl.) ¶ 14.

on the scene.[22]  Durbin also directed plaintiff to report to his office in the company's Decatur headquarters, to review with him the video footage of the accident.[23]  Plaintiff demurred, saying that *she* did not "need" to see the footage, because she had just "experienced" the collision.[24]  Durbin sent plaintiff a text message at 5:52 a.m., asking her to call him when she finished her report to the law enforcement office, but she failed to do so.[25]

Plaintiff delivered the semi-trailer she had pulled with her powered truck tractor to its destination, and "bobtailed" — *i.e.*, drove the truck tractor without the semi-trailer — to White Oak's Decatur garage, to undergo repairs.[26]  She then walked into the adjacent corporate office, and reviewed the camera footage with Safety Coordinator Daniel Howell.[27]  When they concluded the review, plaintiff sat in a chair outside Howell's office.[28]  At some point thereafter, Director of Safety Jim Durbin arrived at the office, but (according to plaintiff) he did not speak to her.[29]  Durbin states, however, that when he saw plaintiff, he asked her to come to his office to

---

[22] Doc. no. 14-1 (Plaintiff dep.), at 39; doc. no. 14-8 (Durbin decl.) ¶ 14.

[23] Doc. no. 14-1 (Plaintiff dep.), at 46-47.

[24] Doc. no. 14-8 (Durbin decl.) ¶ 16; *see also* doc. no. 16 (Conventionally filed video file).

[25] Doc. no. 14-2, at ECF 80; doc. no. 14-8 (Durbin decl.) ¶¶ 17-18.

[26] Doc. no. 14-1 (Plaintiff dep.), at 35.

[27] *Id.* at 35-36.

[28] *Id.* at 54.

[29] *Id.* at 54-55.

review the SmartDrive and Omnitracs camera system video footage, but she refused.[30] Durbin added that, when he reiterated his request, plaintiff replied: "No, I am not going to do that."[31]

Later that morning, around 9:00 a.m., plaintiff walked to the office of Jennifer McClaine, the company's Director of Human Resources.[32] McClaine was not then aware that plaintiff had been involved in an accident. While in McClaine's office, plaintiff stated that she "better not" be fired, and that if she were to be fired, she would wish that she had hit the other driver "harder."[33] Plaintiff then returned to the common area of the office, to wait for repairs to her truck to be completed.[34]

Another employee, Pam Banker, who overheard the comments made by plaintiff in McClaine's office, observed that plaintiff was "in a tizzy," and speaking in a "loud" tone.[35]

McClaine was disturbed by plaintiff's comments, and made a note of the incident, which she reported to Director of Safety Jim Durbin.[36] She sent an email message to Durbin at 10:25 a.m., listing "Hansen" as the subject, and reading as

---

[30] Doc. no. 14-8 (Durbin decl.) ¶ 18.

[31] *Id.*

[32] Doc. no. 14-4 (McClaine dep.), at 76.

[33] *Id.* at 75-76.

[34] *Id.* at 78.

[35] Doc. no. 14-7 (Banker dep.), at 27.

[36] Doc. no. 14-4 (McClaine dep.), at 77-78.

follows:

> 1-31-2024
> 9:00 a.m.
> [Clairissa Hansen] Made a comment in my office that she better not get fired.  If she doesn't get fired then she will be ok.  If she gets fired then she wishes she would have hit them [*i.e.*, the hit-and-run driver] harder and caused more damage.

Doc. no. 14-5, at ECF 48 (alterations supplied).  Durbin replied to the email at 10:39

a.m., saying:

> At 5:50 AM I asked her [Clairissa Hansen] to look at the accident that was on video, she made a comment that she did not need to see the video of the accident.  When I got to the office, I asked her again to look at the video, and again she said she did not need to look at the video, was very hateful toward me.  Dan [Howell] was at the office when she was hateful to me.  I will have Dan send you a statement as well.

*Id.* (alterations supplied).  Daniel Howell sent an email to McClaine at 11:35 a.m.,

stating:

> This morning (1/31/24) Jim asked Clairissa Hansen if she wanted to see the video of the accident she had earlier [reviewed with me] and she replied in a very rude and hateful manner that she did not need to see the video.  She had a very bad attitude towards Jim and a bad attitude about the whole situation.

Doc. no. 14-9 (alteration supplied).[37]

McClaine deemed plaintiff's presence in the office to be disruptive.[38]  In order

to defuse the situation, McClaine secured a hotel room for plaintiff, where she could

---

[37] See text accompanying note 27, *supra.*

[38] *Id*. at 79.

11

await the completion of repairs to her company truck.[39]   Plaintiff agreed to that arrangement, and was transported to the hotel by a White Oak employee.[40]   Plaintiff remained at the hotel overnight — *i.e.*, until the following morning of February 1, 2024.[41]

Director of Safety Durbin testified in a declaration submitted in support of summary judgment that he contacted plaintiff on the morning of February 1, to again provide her the opportunity to review the video footage with him, but she declined to do so.[42]

Durbin, McClaine, and Mike Limbaugh, the owner of White Oak, met either on January 31 or February 1 to discuss what they perceived to be plaintiff's unwillingness to review the footage with Durbin, as he had directed.[43]   They decided that plaintiff's refusal to follow Durbin's instructions warranted termination of her employment.[44]   Durbin and McClaine called plaintiff on February 1st, while she was still at the hotel, and told her that her employment was terminated.[45]

---

[39] *Id.*

[40] *Id.* at 80.

[41] Doc. no. 14-1 (Plaintiff dep.), at 55.

[42] Doc. no. 14-8 (Durbin decl.) ¶ 21.

[43] Doc. no. 14-4 (McClaine dep.), at 71.

[44] *Id.* at 71-72; *see also* doc. no. 14-8 (Durbin decl.) ¶ 23.

[45] Doc. no. 14-1 (Plaintiff dep.), at 55, 57; *see also* doc. 14-5 (McClaine statement), at ECF 53.

Plaintiff testified during deposition that Human Resources Manager Jennifer McClaine told her that she was being terminated "because the accident looked intentional, and that it was a preventable accident, and [she . . .] chose not to stop."[46] McClaine's account is distinctly different. Her February 1, 2024 separation notice stated:

> Reason for Termination: Failure to Adhere to Safety Instruction
>
> Ms. Hansen was involved in an accident the morning of January 31, 2024. Ms. Hansen was given instructions to meet with the Director of Safety to review footage of the accident. Ms. Hansen refused to meet with the Director of Safety to review this footage.

Doc. no. 14-2 (Separation Notice), at ECF 43.

Plaintiff returned to her Georgia residence on February 1, 2024,[47] and filed a charge of discrimination with the Equal Employment Opportunity Commission on February 6, 2024. She alleged that she had been discriminated against on the basis of her gender, female.[48] The EEOC issued a determination and notice of rights on March 13, 2025,[49] and plaintiff commenced this action on June 11, 2025.[50]

---

[46] Doc. no. 14-1 (Plaintiff dep.), at 57 (alteration supplied).

[47] *Id.* at 55.

[48] Doc. no. 14-2 (Charge of Discrimination), at ECF 45-49.

[49] *Id.* (Determination and Notice of Right to Sue), at ECF 50-53.

[50] Doc. no. 1 (Complaint).

## III. DISCUSSION

Plaintiff relies upon circumstantial evidence to demonstrate her former employer's intention to discriminate and, thereby, rebut defendant's motion for summary judgment.

Federal courts typically evaluate the sufficiency of circumstantial evidence by using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under the three-step framework elaborated in those opinions, a plaintiff must initially establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class (*i.e.*, she is a female); (2) she was qualified to perform the duties of her former job; (3) she was subjected to an adverse employment action (*i.e.*, she was fired); and (4) she has been treated less favorably than a similarly situated individual outside her protected class. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). More specifically, plaintiff must show that she engaged, either disputedly or admittedly, in misconduct similar to that of a similarly situated male employee, but that despite such similarities, she was subjected to different, harsher discipline than her male co-employee. *See, e.g.*, *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792

14

(11th Cir. 1999).

If plaintiff establishes a *prima facie* case, then, in order to avoid a judgment in favor of plaintiff, defendant must proffer a legitimate, non-discriminatory reason for the adverse employment action.  If defendant does so, the burden then shifts back to plaintiff, to establish that the defendant's proffered reason amounts to nothing more than a pretext for discrimination.

In the present case, defendant does not dispute that plaintiff has satisfied the first three elements of a *prima facie* case.  Defendant contends, however, that plaintiff cannot produce evidence that "similarly situated" male employees were treated more favorably.

To overcome that contention, plaintiff must show that her male comparators are "similarly situated in all material respects."  *Lewis v. City of Union City*, 918 F.3d 1213, 1229 (11th Cir. 2019).  In other words, she "and her comparators must be sufficiently similar, in an objective sense, that they 'cannot be reasonably distinguished.'"  *Id.* (quoting *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 230 (2015)).

In an effort to satisfy that element, plaintiff points to the "Accident Register" created by defendant for the date range of November 2023 through March 2024.  That "Register" lists, in the form of a chart, the names, race, and sex of twelve employees,

the dates of motor-vehicle collisions in which each person was involved, whether the accident was "preventable," and the "action taken."[51]  Plaintiff contends that the register shows that at least seven male drivers who were involved in motor-vehicle accidents were not terminated, but "received only verbal warnings."[52]  Plaintiff states that those male employees were subject to the same post-accident policies under the same Safety Director (Jim Durbin) and, thus, are "similarly situated in all material respects."[53]

As an initial matter, plaintiff asks the court to conclude (that is, draw as a favorable inference) that the reason for her termination was the accident in which she was involved.  However, such an inference is based solely upon plaintiff's subjective opinion.  No other evidence supports it.  Therefore, the inference is not "reasonable," and contradicts objective, contemporaneous, evidence that she was terminated for her failure to follow Durbin's instruction to cooperate with the post-accident investigation.  For example, the separation notice sent to plaintiff on February 1, 2024, the day following the accident, described the reason for termination as "Failure to Adhere to Safety Instruction," and specifically noted plaintiff's refusal to meet with Durbin to review the video footage of the accident.  Plaintiff did not identify *any* male

---

[51] Doc. no. 14-5, at 57.

[52] Doc. no. 20 (Plaintiff's Brief in Opposition to Summary Judgment), at 12.

[53] *Id.*

16

comparators who failed to cooperate with a post-accident investigation, but were not terminated.

Even if this court were to accept plaintiff's subjective contention that her involvement in a preventable accident was the reason for her termination, it is clear from the record that the information contained in the "Accident Register" does not support the conclusion drawn by plaintiff that male drivers who had preventable accidents received only verbal warnings.

The record does not contain an explanation for the creation of the register.[54]

When asked about the significance of the notation "verbal" in the "action taken" column, Jennifer McClaine stated:

> Primarily it would mean that they spoke with Jim [Durbin]. It's not any kind of — it does not notate on here whether or not any disciplinary action was taken. He spoke to them. This means there was verbal coaching. Obviously, if there was write-ups, we would have that documented separately.

Doc. no. 14-4 (McClaine dep.), at 98-99 (alteration supplied). McClaine testified that on the two occasions on which an accident was recorded as "non-preventable," the "action taken" was listed as "none" — meaning that no verbal coaching occurred.[55]

---

[54] Jennifer McClaine testified that the Register was "pieced together" with excerpts from other records. Doc. no. 14-4 (McClaine dep.), at 97-98 ("I believe it was created upon — I believe the registry [sic] — I'm not sure of the original creation date. I know that it was excerpt[s] pulled just for those particular dates that was requested, but it was on an Excel sheet with other accidents as well. It was pieced together.") (alterations supplied).

[55] Id. at 100.

With respect to a male driver who was involved — like plaintiff — in a "preventable accident," the following exchange occurred:

> Q.   Then I see here if we go down one [row], we have [a driver named] *Anthony Torres. . . .* There was an accident that happened on January 29, 2024.  Preventable it says, yes.  Action taken, verbal.  To the best of your knowledge, does that mean that they had a verbal conversation?
>
> A.   They did have a verbal conversation.  I do recall Mr. Torres was — we have an office in Savannah, Georgia, and that's where the accident took place.  It would have been an over-the-phone conversation that they had.
>
> Q.   Did he review camera footage?
>
> A.   I'm not aware if he did or not.
>
> Q.   Would Jim Durbin be the one that knows about that?
>
> A.   Yes.
>
> Q.   Okay.
>
> A.   *He was terminated due to that accident.*
>
> Q.   *He was terminated?*
>
> A.   *Yes, he was.*
>
> Q.   Okay.  So when it says, action taken, verbal, that really means there was a conversation had?
>
> A.   Correct.

*Id.* at 100-01 (all emphasis supplied).  Therefore, based upon McClaine's deposition

testimony, it is clear that at least one male truck driver was fired because, like plaintiff, he was involved in a preventable accident. And it also is clear that the notation "verbal" recorded in the "action taken" column does not signify that the driver received only a verbal warning — rather, it reflects that the driver discussed the accident with the company's Director of Safety, Jim Durbin, in accordance with defendant's policy. That interpretation of the information contained in the "Accident Register" is reinforced by the fact that the row which pertains to plaintiff contains the notation "Yes" in the "Preventable" column, and "Refused" in the "Action Taken" column, thereby indicating that she did *not* discuss the accident with Durbin.[56]

Plaintiff also contends that Dee Kennedy and Craig Darby are comparators,[57] but she has provided no evidence, or even an explanation, demonstrating that those individuals are similarly situated.[58] Indeed, when asked during deposition why she believed that Kennedy was similarly situated, plaintiff responded that he was not: *i.e.*, "Dee Kennedy *was a whole different situation*. He actually verbally and physically threatened me on camera, and was never reprimanded for it."[59]

Simply put, plaintiff has not shown that her proposed comparators were

---

[56] Doc. no. 14-5 (Accident Register), at ECF 57.

[57] Doc. no. 20 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), at 12.

[58] Plaintiff's complaint states that Darby and Kennedy caused "extensive damage" to trailers, but were not terminated. Doc. no. 1 (Complaint) ¶¶ 19, 20.

[59] Doc. no. 14-2 (Plaintiff dep.), at 68 (emphasis supplied).

"sufficiently similar, in an objective sense, that they 'cannot be reasonably distinguished.'" *Lewis*, 918 F.3d at 1229 (quoting *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 230 (2015)). Accordingly, plaintiff failed to establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework.

That does not end the inquiry, however. The Eleventh Circuit has explained that, when a plaintiff cannot establish a *prima facia* case,

> the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court, therefore, should advance directly to *the convincing mosaic inquiry*.

*Ismael v. Roundtree*, 161 F.4th 752, 765 (11th Cir. 2025) (emphasis supplied). In other words, even without suitable comparators, "the plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory motive." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (alteration supplied). As the Eleventh Circuit later explicated in the case of *Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019):

> This, of course, is perfectly logical. Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place. Accordingly, a "plaintiff will always survive summary judgment if he presents . . . '*a convincing mosaic of circumstantial evidence* that would allow a jury to infer intentional discrimination.'"

20

*Id.* at 1185 (quoting *Silverman v. Board of Education of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)) (emphasis supplied).

Evidence that might create a "convincing mosaic of circumstantial evidence" includes: "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn"; systematically better treatment of similarly situated employees; and, other circumstantial facts tending to show that the employer's justification is pretextual. *Lewis*, 934 F.3d at 1185.

Plaintiff alleges that the following tesserae[60] form a convincing mosaic of circumstantial evidence from which an inference of discrimination may be drawn: (1) the "Accident Register" previously discussed; (2) defendant's allegedly shifting reasons for plaintiff's termination; (3) plaintiff's testimony that Jim Durbin told her that she was fired because she had an avoidable accident; and (4) plaintiff's review of the video footage with defendant's safety coordinator, Daniel Howell.[61]

As discussed earlier, the information contained in the "Accident Register" does not indicate that male employees were *treated* differently than plaintiff; only that they *acted* differently than plaintiff with respect to participating in defendant's post-

---

[60] *Tesserae* is the plural form of the Greek word *tessera*, which is defined as a small block of stone, tile, wood, or bone used to create a mosaic.

[61] Doc. no. 20 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 16.

21

accident investigation.

Plaintiff's second contention is that defendant offered four different, "shifting," reasons for her termination:  specifically (1) plaintiff testified that Durbin told her that she was terminated for "failure to avoid an avoidable crash"; (2) the comment on defendant's "Employee Change of Status Form," that plaintiff was terminated because of "safety violation — accident, refused to meet with safety director"; (3) the separation notice provided to plaintiff, listing the reason for termination as "Failure to Adhere to Safety Instruction," and stating that plaintiff "refused to meet with the Director of Safety to review this [the camera] footage"; and (4) McClaine's deposition testimony that plaintiff was fired for "insubordination," because "she would not speak to someone."[62]  Plaintiff argues that those varied statements of the reason for her termination undermine defendant's position that the true reason for plaintiff's termination was her failure to follow Jim Durbin's instruction to review the dashboard camera footage with him.  Defendant argues that the cited reasons are not "shifting"; rather, they are "merely different aspects of the same underlying issue."[63]  With the exception of the first-cited reason (*i.e.*, plaintiff's testimony that Durbin told her she was fired for failing to avoid a crash), the court agrees.  The remaining reasons given

---

[62] *Id.* at 13 (citing (1) doc. no. 14-1 (Plaintiff dep.), at 67; (2) doc. no. 14-5, at ECF 47; (3) doc. no. 14-4, at ECF 43; and (4) doc. no. 14-4 (McClaine dep.), at 102).

[63] Doc. no. 21 (Reply Brief in Support of Summary Judgment), at 9.

may use different wording, but they all amount to the same thing: plaintiff's employment was terminated because she refused to follow Durbin's instruction to review the video footage with him as part of the post-accident investigation.

In addition to contending that her testimony about her conversation with Durbin was a "shifting" reason for her termination, plaintiff also identifies that testimony as a tile in her mosaic. Plaintiff's testimony is not corroborated in the record, but even if it is credited, plaintiff fails to show how her testimony could lead to an inference of intentional discrimination. This is especially true since, as discussed above, at least one male truck driver was terminated because he also was involved in a preventable accident.

Lastly, plaintiff argues that because she reviewed the video footage with Daniel Howell, defendant's contention that she refused to meet with safety personnel to review the accident is suspect. That contention is without merit. Defendant has offered evidence to show that the Director of Safety, Jim Durbin, instructed plaintiff to view the footage with him in accordance with defendant's post-accident policy, and she did not do so.

The court concludes that plaintiff failed to present a "convincing mosaic of circumstantial evidence" from which a reasonable jury could infer that defendant intentionally discriminated against plaintiff on the basis of her gender. That

23

conclusion is strengthened by plaintiff's testimony during deposition, during which the following exchange occurred:

Q.   Had you had issues prior to this that you believed that you were being targeted for termination?

A.   No.  I had no reason to be.  I mean, I only damaged one trailer.

I mean, there were several incidents that happened.  My front bumper fell off going down the road and went into a million pieces.  But my truck had just come out from the shop and the shop failed to put the bolt properly back in, and the vibration is what caused that to come off.  So that wasn't my fault.

Q.   *Well, do you think that White Oak was trying to get rid of you because you're female?*

A.   *No. No.  I don't think so.*

MR. MULLEN: I'm going to object to the form.  I know she already answered it, but I'm going to go ahead and object to the form to it.

Q.   So why do you think you were fired?

MR. MULLEN: I'm going to object to the form, but she can answer.

A.   *For damaging a vehicle.*

Q.   Any other reason?

A.   I mean, it all boils down to that.

Q.   Any other reason?

A.   *If it wasn't for having that accident, I'd still be working there*

24

*today*.

Doc. no. 14-1 (Plaintiff dep.), at 99-100 (emphasis supplied). The court cannot conceive of a valid objection to defendant's counsel's questions, and counsel did not move to strike that colloquy. Although plaintiff testified elsewhere in her deposition that male employees who had damaged property were not terminated,[64] her response to defendant's counsel's clear and direct question that she did not believe that defendant fired her because she was female seriously undermines her claim that defendant discriminated against her on the basis of her sex.

## IV.  CONCLUSION

In sum, the court concludes that defendant's motion for summary judgment should be granted. Plaintiff produced no evidence to show that male employees who refused to cooperate with the company's post-accident investigation were treated more favorably. Even if the court were to credit plaintiff's contention that she was fired because of a preventable accident, defendant produced evidence that a male employee, Anthony Torres, was terminated for that same reason. Put simply, plaintiff did not present circumstantial evidence from which an inference of intentional discrimination may be drawn, and her claim of sex discrimination cannot stand.

---

[64] *See* doc. no. 14-1 (Plaintiff dep.), at 67.

A Final Judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 11th day of June, 2026.

_____
Senior United States District Judge